**Bernard FEIFER and Beverly J. Feifer, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. C79–1619A.**

United States District Court, N. D. Georgia, Atlanta Division.

Oct. 6, 1980.

Cleburne E. Gregory, Jr., Cleburne E. Gregory, III, Arnall, Golden & Gregory, Atlanta, Ga., for plaintiffs.

William L. Harper, U. S. Atty., Barbara A. Harris, Asst. U. S. Atty., Atlanta, Ga., Steven L. Gremminger, Gerald B. Leedom, Attys. Tax Division, Dept. of Justice, Washington, D. C., for defendant.

### ORDER

SHOOB, District Judge.

This is a refund action in which plaintiffs seek to recover federal income taxes paid with respect to their 1974 income tax year. Plaintiffs filed a joint federal income tax return for that year.

The two issues before the Court in this case are (1) the applicability of § 483 of the Internal Revenue Code to a certain escrow arrangement and (2) the allocation of part of the purchase price for certain stock to the enlargement of a covenant not to compete. The parties to this action agree that

the first issue is a question of law. They have filed cross motions for summary judgment and a joint stipulation of facts as to that issue. Plaintiffs have moved for summary judgment as to the second issue as well, but defendant contends that as to that issue there are questions of fact.

## FACTS

Plaintiff Bernard Feifer ("Taxpayer") and three other individuals (collectively, the "Shareholders") owned all the stock of International Consolidated, Inc. ("International"), a corporation engaged in processing bakery waste for use as an animal feed ingredient. Taxpayer owned 9,700 shares of International stock, and the other Shareholders owned 300 shares each. The Shareholders wished to exchange their International stock for more marketable securities, and on May 14, 1971 they entered into a plan of reorganization and agreement of merger (the "Acquisition Agreement") with Kane–Miller Corporation ("Kane–Miller"). Kane–Miller was a publicly traded conglomerate which acquired companies in the food and feed business.

International was acquired by a wholly-owned subsidiary of Kane–Miller in a merger which qualified as a nontaxable corporate reorganization. The assets of International were acquired by the Kane–Miller subsidiary in exchange for Kane–Miller common voting stock issued to and in the names of the Shareholders, and the stock of International was cancelled. Of the 174,999 shares of Kane–Miller common voting stock issued to Shareholders, Taxpayer received 160,143 shares.

The parties to the merger were unable to agree upon a value for International. Additionally, the acquiring corporation wished to be protected against any contingent liabilities of International. Accordingly, the Acquisition Agreement provided that Shareholders would place in escrow certain of the shares of Kane–Miller stock which they received in the reorganization. Certain shares of the escrowed stock were designated "Collateral Shares" to be held in escrow for two years to indemnify the ac-

quiring corporation against any contingent liabilities of International. Other shares of the escrowed stock were designated "Earnings Shares," and they were placed in escrow to be released no later than April 30, 1975 based upon satisfaction of certain earnings requirements by the business formerly operated by International. The parties structured the escrow transaction with the intent to prevent the application of § 483 of the Internal Revenue Code.

Following are the characteristics of the escrow transaction which are relevant to this case:

1. Cash dividends and distributions to the escrow agent as to the Earnings Shares were to be distributed to the person to whom the Earnings Shares were ultimately distributed.

2. Taxpayer received Forms 1099 as to the dividends paid on the Earnings Shares he placed in escrow, and during the years those shares were held in escrow he included the taxable dividends paid on the shares in his gross income for federal income tax purposes.

3. Stock splits and stock dividends on the escrowed shares were to be added to the escrow reserves.

4. Shareholders exercised full voting rights with respect to the Collateral Shares. They also exercised voting rights with respect to the Earnings Shares, but they were required to vote those shares in proportion to the vote of the total outstanding shares of Kane–Miller on any issue.

5. At the direction of Shareholders the escrow agent was allowed to, but not required to, invest any cash in the escrow reserve. Shareholders were to pay any taxes resulting from such investments, and any profits were to be delivered to the recipient of the cash invested when the shares were released from escrow.

6. Shareholders paid the escrow agent's service charges and expenses.

The Earnings Shares which Shareholders placed in escrow were released to them on July 1, 1974. On that same date Kane–Miller repurchased the shares released to

Shareholders for a total consideration of $1,160,038.00 of which Taxpayer received $1,061,433.86. As part of the release and repurchase agreement Taxpayer agreed to the enlargement of a covenant not to compete which he had earlier given to Kane–Miller. No part of the amount which Kane–Miller paid Taxpayer for his stock was allocated in the agreement to the enlargement of the covenant not to compete, however.

Plaintiffs treated the release of the shares from escrow on July 1, 1974 as nontaxable on the ground that Taxpayer had received the shares in 1971 as part of a tax–free reorganization. Plaintiffs treated the $1,061,433.86 which Taxpayer received from Kane–Miller as capital gain realized from the sale of stock. Defendant determined that the release of the Earnings Shares from escrow was a deferred payment to which § 483 of the Internal Revenue Code applied and that $118,527.00 of the value of those shares constituted interest income to plaintiffs. Additionally, defendant determined that $200,000.00 of the amount which Taxpayer received from Kane–Miller for his stock represented consideration for the enlargement of the covenant not to compete and should therefore be treated as ordinary income.

Defendant assessed a deficiency against plaintiffs in the amount of $47,189.00 plus statutory interest, and plaintiffs paid the $59,475.92 assessment. Plaintiffs properly filed a claim for refund, and in this action they seek to recover their alleged overpayment.

### APPLICATION OF § 483 TO THE RELEASE OF THE EARNINGS SHARES FROM ESCROW

Under § 483 of the Internal Revenue Code interest is imputed according to a statutory formula on certain deferred payments. The section applies to

... any payment on account of the sale or exchange of property which constitutes part or all of the sales price and which is due more than 6 months after the date of such sale or exchange under a contract—

(A) under which some or all of the payments are due more than one year after the date of such sale or exchange, and

(B) under which, using a rate provided by regulations prescribed by the Secretary for purposes of this subparagraph, there is total unstated interest.

26 U.S.C. § 483(c). Interest imputed under § 483 constitutes ordinary income to the seller of property for federal income tax purposes. The purpose of § 483 is to prevent capital gains treatment of amounts which represent an adjustment to a purchase price and which would otherwise be ordinary income, as interest on a deferred payment or as earnings on a payment which is not deferred. Defendant's position is that the release of the Earnings Shares from escrow was the payment to Taxpayer for the assets of International and that § 483 applies because the payment was in 1974, more than a year after the merger. Plaintiffs contend that payment for the assets of International occurred at the time of the merger when the shares of Kane–Miller stock, including the Earnings Shares, were issued to the Shareholders and that release of the Earnings Shares from escrow was not a payment for purposes of § 483.

Plaintiffs do not deny that § 483 would apply to a deferred stock distribution or contingent stock arrangement in a corporate reorganization where the receipt of stock by shareholders of an acquired corporation depends on the occurrence of certain contingencies. Plaintiffs contend, however, that the present situation is different because the Kane–Miller stock was actually issued to and in the names of the Shareholders.

It is clear that a transaction may be structured as an escrow arrangement, as contrasted with a deferred stock distribution or a contingent stock arrangement, and not involve a payment which is subject to § 483. Treasury Regulation § 1.483–1(b)(6), Example (8); Revenue Ruling 70–120, 1970–1 CB 124. Defendant accordingly cannot contend that a release of stock from

escrow after more than one year is necessarily a deferred payment for purposes of § 483 and no different from a deferred stock distribution or contingent stock arrangement. Defendant contends instead that the escrow arrangement before the Court involves a deferred payment because it is distinguishable from the escrow arrangements described in the regulation and the revenue ruling.

Defendant points to two aspects of the escrow arrangement before the Court and contends that they preclude a finding that the arrangement falls within the regulation and the ruling: (1) the fact that Shareholders did not currently receive earnings on the escrowed stock, and (2) the fact that Shareholders' right to vote the Earnings Shares was restricted. The shareholders of the acquired corporation in the regulation did not currently receive dividends on their escrowed stock, however. The Court finds that current receipt of dividends is not required for an escrow arrangement to be outside the application of § 483.

Except for the restriction on voting rights, the escrow arrangement before the Court is identical to an escrow arrangement which would clearly be outside the application of § 483 under the regulation and the revenue ruling. Treasury Regulation § 1.483–1(b)(6), Example (8), involved a tax–free reorganization in which P corporation contracted to acquire the one–half interest of R corporation held by Q corporation in exchange for shares of P voting stock. P issued shares of its stock to Q, and Q placed some of the stock in escrow. If at the end of three years R's net profits did not exceed a specified amount, all or a part of the escrowed stock, along with earnings and dividends, would be returned to P. During the period of the escrow, however, Q was entitled to vote the escrowed stock, and Q included in current income the dividends and earnings on the stock. In Revenue Ruling 70–120, 1970–1 CB 124, shareholders of X corporation exchanged X common stock for Y voting common stock as part of a tax–free merger. Y issued stock to the X shareholders, and the X shareholders deposited some of it in escrow subject to retransfer to Y within five years if the earnings of the business formerly conducted by X did not maintain a specified level or if warranties or representations made by X were breached. The former X shareholders were entitled to vote the escrowed stock, and they received the dividends paid on the stock. In both these situations the payments of stock were considered to have occurred before the stock was placed in escrow, and § 483 was found not to apply to the later release of the escrowed stock.

Defendant has not shown why the escrow arrangement before the Court, in so many respects like the arrangements in the regulation and the ruling, should be treated differently simply because of the restriction on the right to vote the Earnings Shares. Defendant has not cited authority for the proposition that the existence of unfettered voting rights makes the difference between an outright transfer of stock and a wholly qualified or contingent transfer. The stock was issued to and in the names of Shareholders and it had present value to them as consideration for the assets of International whether or not they could vote it. The Court finds that the escrow arrangement before it falls within Treasury Regulation § 1.483–1(b)(6), Example (8) and Revenue Ruling 70–120, 1970–1 CB 124.

Even without reliance on the regulation and the ruling which control the § 483 issue in this case, the Court finds that the arrangement before it is not the type of situation at which § 483 is directed. Kane–Miller issued stock as consideration for assets of International, and from that date forward the Shareholders paid tax on the earnings of that consideration. The situation is no different for purposes of the policy behind § 483 than a situation in which shareholders receive stock as consideration for assets but do not place it in escrow. This is not a situation in which part of certain consideration, which should be treated as ordinary interest income rather than as part of a purchase price, is being mischaracterized by means of a deferred payment.

The Court finds that payment for the assets of International was made to Shareholders at the time of the merger and that § 483 does not apply to the release of the Earnings Shares from escrow in 1974. No amount of the value of the stock should be characterized as interest.

## ALLOCATION OF CONSIDERATION TO THE ENLARGEMENT OF THE COVENANT NOT TO COMPETE

█ Defendant's sole contention with respect to plaintiffs' motion for summary judgment on the issue of allocation of consideration to Taxpayer's enlargement of the covenant not to compete is that there are questions of fact which make the issue inappropriate for resolution by means of summary judgment. The Fifth Circuit has recently rejected a similar contention, however.

In *Better Beverages, Inc. v. United States*, 619 F.2d 424 (5th Cir. 1980), individuals sold a business and gave the purchaser a covenant not to compete. No amount of the purchase price for the business was allocated to the covenant in the written agreement between the parties to the sale. The sellers did not treat any portion of the purchase price for the business as consideration for the covenant for tax purposes because consideration for the covenant would have been ordinary income to them. The purchaser treated a substantial sum as consideration for the covenant because that was to its advantage for tax purposes. The district court consolidated the actions of the Internal Revenue Service against each of the parties to the sale of the business and, by means of summary judgment, held that no part of the purchase price would be found to be allocated to the covenant not to compete "in the absence of any evidence or allegation that both parties *agreed* to an allocation." At 426 (emphasis original.) The Fifth Circuit affirmed, rejecting the purchaser's position that

> given the lack of an express, agreed apportionment of the purchase price among *any* of the components of the business, an allocation of a portion of that lump sum

price to the covenant not to compete, as to any other item, may be *inferred* upon proof of its real economic value, and that the assertions in its affidavits of the high value it placed on the covenant were sufficient to raise a genuine question of fact on this point.

At 426 (emphasis original.)

The Fifth Circuit in the *Better Beverages* case noted that evidence of value of the covenant to the purchaser was material only if probative of actual cost and that covenants not to compete are not susceptible to abstract fair market valuation:

> [T]he interest relinquished by the seller in executing a covenant not to compete is not parallel to that sought or received by the buyer. . . . For example, while a buyer may place great significance on the covenant as a protective device, a seller, who either does not desire to re–enter the market or who is independently foreclosed from re–entry, may place virtually no value on the same covenant.

At 429. The Fifth Circuit followed what it noted to be a trend among courts in similar cases "to require the buyer to prove that the parties mutually intended at the time of the sale that some portion of the lump sum consideration be allocated to the seller's covenant not to compete." At 430. The Court held that the purchaser had the burden of proof as to an allocation of part of the purchase price to the covenant not to compete and that the burden could be satisfied only by "proof of the parties' specific agreement, expressed or implied" to allocate part of the purchase price to the covenant. At 430. Better Beverages, Inc. had stated in responses to interrogatories that no agreement as to allocation of consideration to the covenant had been reached and that, in fact, the idea had not been discussed. The Fifth Circuit found that it was therefore appropriate for the district court to decide as a matter of law that no part of the purchase price for the sellers' business was consideration for the covenant not to compete. On the basis of the *Better Beverages* opinion, this Court finds that defendant has the burden of proving a specific

agreement between Taxpayer and Kane–Miller that part of the purchase price for Taxpayer's Kane–Miller stock was consideration for Taxpayer's enlargement of his covenant not to compete.

Harold Oelbaum, who was Senior Vice President, Administration, and General Counsel of Kane–Miller in 1974 (Oelbaum deposition, p. 4), was the principal negotiator for Kane–Miller in connection with the understandings in the agreement pursuant to which Taxpayer sold to Kane–Miller his shares of Kane–Miller stock which were released from escrow and in which Taxpayer agreed to the enlargement of his earlier covenant not to compete (Oelbaum deposition, pp. 9–11.) Defendant intends to introduce Mr. Oelbaum's deposition testimony at trial, but defendant has stated in the pretrial order in this case that there are no live witnesses whom it will have present at the trial. Defendant has listed two "may call" witnesses in the pretrial order, but it appears that it is Mr. Oelbaum's testimony on which defendant relies for its contention that an amount of the purchase price for Taxpayer's stock was allocated as consideration for enlargement of the covenant not to compete.

Defendant's theory is that the enlargement of the covenant not to compete had real value to Kane–Miller. Mr. Oelbaum's deposition contains a great deal of testimony about the value of the covenant to Kane–Miller, about the company's reasons for wanting it and about the company's treatment of the covenant on its books. Additionally, defendant relies on the fact that the price paid to Taxpayer for his Kane–Miller stock included a premium in that it was greater than the July 1, 1974 trading value of the stock. Defendant contends that the premium was bargained–for consideration for the enlargement of the covenant not to compete.

The *Better Beverages* case makes it clear that a purchaser cannot satisfy its burden of proof as to allocation of consideration to a covenant not to compete by showing the importance of the covenant to the purchaser. In the transaction before this Court, it

appears that the enlargement of the covenant not to compete meant little to Taxpayer:

Q [By Mr. Gregory, counsel for Taxpayer] Isn't it true that during the negotiations Jon Golden [also counsel for Taxpayer] told you that Mr. Feifer [Taxpayer] was going into the real estate business?

A I believe that—let me say this:

Jon Golden told me that Mr. Feifer was going in the real estate business. I just don't recall whether it was in connection with this transaction or the one in 1975. I think it was in connection with this one.

. . . . .

Q Didn't Jon tell you that because of that, Bernie [Taxpayer] wasn't concerned with the covenant not to compete?

A Jon was not concerned about giving us a covenant not to compete. It was very important to us, though. And he said we could have it.

. . . . .

There was not a major issue on the covenant. Mr. Feifer was agreeable to giving us a covenant, in substance, and there were not lengthy negotiations concerning the delineation or the timing of it. There may have been some discussion but it was not a principal issue.

(Oelbaum deposition, pp. 58–60). Furthermore, it appears that there may have been reason for the premium paid to Taxpayer for his Kane–Miller stock other than consideration for enlargement of the covenant not to compete. Mr. Oelbaum testified that Taxpayer wanted "a very substantial premium in order to sell his shares and go away." (Oelbaum deposition, p. 13.) Relations between Taxpayer and the management of Kane–Miller had deteriorated by July of 1974 (Oelbaum deposition, p. 15), and it appears that it may have been worth a premium to Kane–Miller to assure that Taxpayer would be out of its way. (cf. Oelbaum deposition, pp. 67–69.) Finally, Mr. Oelbaum, the representative of Kane–Miller who negotiated the repurchase of the Kane–Miller stock from Taxpayer and the

enlargement of the covenant not to compete, testified that allocation of consideration to the enlargement of the covenant was not discussed:

> Q [By Mr. Gregory]   Isn't it true that you never discussed with Jon Golden or with Mr. Feifer the allocation of any amount to a covenant not to compete?
>
> A That's correct.  To a covenant not to compete specifically but we always talked about that there would be a premium paid which Mr. Feifer wanted.
>
> And we also discussed what those items would be but we never discussed allocating anything in the agreement itself.

(Oelbaum deposition, p. 58.)

There was no express allocation of consideration by Taxpayer and Kane–Miller to Taxpayer's enlargement of the covenant not to compete.  Further, it appears that defendant is not able to meet its burden of showing an agreed–upon allocation of consideration to enlargement of the covenant by proving any implied agreement to that effect.  The situation appears identical to that in the *Better Beverages* case in which the Fifth Circuit states:

> The ultimate inquiry is not whether there existed any type of agreement, but what, if any, portion of the lump sum price actually was exchanged for the covenant, and a taxpayer could conceivably carry that burden of proof without evidence of an agreement. (Cites omitted.)  Aside from its unpersuasive reliance on its own assessments of the covenant's value, however, Better Beverages has presented no other such alternative theories.

At 431.

If trial were held in this case the only question for resolution would be whether consideration was allocated to the enlargement of the covenant not to compete.  The Court finds from the record in this case that there was no agreement, express or implied, to make such an allocation and that, as a matter of law, there was no allocation of consideration to the enlargement of the covenant.  Accordingly, plaintiffs are entitled to summary judgment on the issue of allocation of consideration to enlargement of the covenant not to compete.

## CONCLUSION

Plaintiffs are GRANTED summary judgment as to both issues in this case.  The Court finds that § 483 does not apply to the release of the Earnings Shares from escrow to Taxpayer.  The Court further finds that there was no allocation of consideration to Taxpayer's enlargement of his covenant not to compete.  Accordingly, it is ORDERED that plaintiffs have judgment in the amount of $59,475.92 and that defendant refund that amount to them as an amount of tax overpaid, along with costs of this action and interest as provided by law.